UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
——————————————————————

UNITED STATES OF AMERICA,

                Plaintiff,

       v.

FRANKLIN BROCK, JR.,

                Defendant.

——————————————————————

<u>DECISION & ORDER</u> and
<u>REPORT & RECOMMENDATION</u>

13-CR-6025CJS

## <u>PRELIMINARY STATEMENT</u>

By Order of Hon. Charles J. Siragusa, United States District Judge, dated September 12, 2013, all pretrial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 34).

On September 9, 2014, the grand jury returned a third superseding indictment against Tyshawn Simmons ("Simmons"), Marquis McMillian ("McMillian"), Franklin Brock, Jr. ("Brock"), Melvin Hill ("Hill"), Franklin Brock, Sr. ("Brock, Sr."), Patrick Christner ("Christner"), Tina McDonald ("McDonald"), and Ciarra Crane ("Crane"). (Docket # 362). Relevant to this decision, the first count of the ten-count third superseding indictment charges all defendants, along with Tashaka Mitchum, Schmillion Weaver, and Devin Allen-Furtick, with conspiring from January 2006 through April 2013 to possess with the intent to distribute and to distribute heroin, cocaine, cocaine base, and marijuana, in violation of 21 U.S.C. § 846. (*Id.*). The second count of the indictment charges Simmons, McMillian, McDonald, and Brock with possession of firearms in furtherance of the drug conspiracy, in violation of 18 U.S.C.

§§ 924(c)(1)(A) and 2.  (*Id.*).  The third count charges Simmons, McMillian, and Brock with

attempting to kill an individual in retaliation for providing information to law enforcement about

a federal offense, in violation of 18 U.S.C. §§ 1513(a)(1)(B), 1513(a)(2)(B) and 2.  (*Id.*).

Finally, the fourth count of the indictment charges Simmons, McMillian, and Brock with using

and discharging a firearm in furtherance of the crime alleged in the third count, in violation of 18

U.S.C. §§ 924(c)(1)(A)(iii) and 2.  (*Id.*).  Brock is not charged in the remaining counts.  (*Id.*).

Currently pending before the Court for report and recommendation are Brock's

motions to determine the applicability of the Juvenile Delinquency Act to Count One, the

narcotics conspiracy charge, and to suppress tangible evidence.[1]  (Docket # 183 at ¶¶ 6-7,

16-21).  Also pending before this Court are motions by Brock for a bill of particulars and

disclosure of *Brady* material.  (*Id.* at ¶¶ 9-14, 25-26).  For the reasons discussed below, I

recommend that the district court determine that the Juvenile Delinquency Act does not apply to

Count One and that it grant Brock's motion to suppress tangible evidence, and I grant in part

Brock's motion for a bill of particulars and deny without prejudice his motion for disclosure of

*Brady* material.


## FACTUAL BACKGROUND

This Court conducted an evidentiary hearing concerning the circumstances

surrounding a traffic stop of a vehicle driven by Brock and the subsequent search of him.[2]

(Docket ## 278, 293, 305).  During the hearing, the government offered testimony of New York

---

[1] Brock filed omnibus motions seeking other forms of relief including, *inter alia*, discovery, preservation
of evidence, and inspection of evidence.  (Docket # 217).  Each of the above-referenced motions was decided by the
undersigned or resolved by the parties in open court on October 17, 2013.  (Docket ## 216, 217).

[2] The transcripts of the hearings held on January 27, 2014, February 26, 2014, and March 14, 2014, shall
be referred to as "Tr. __."  (Docket ## 294, 295, 311).

State Police Trooper Thomas Walton ("Walton"), and Brock testified on his own behalf and offered the testimony of New York State Police Troopers Oliver Gorevski ("Gorevski"), Eric Salamone ("Salamone") and Michael Kien ("Kien"), and Stephen Fischer ("Fischer"), a research technician in the City of Rochester's Emergency Communications Department. (Tr. 3-4, 87, 121-22, 139, 157-58, 195).

### A.      Testimony of Walton

Walton testified that he had been employed as a New York State Trooper for approximately ten years. (Tr. 4). On January 4, 2013, Walton and his partner Gorevski were on patrol duty in the east side of the City of Rochester. (Tr. 4-5). According to Walton, two other New York State Police patrol cars were also on patrol duty in the same area. (Tr. 5-6).

At approximately 7:15 p.m., Walton, who was driving a marked patrol car, noticed a blue Chevy Malibu in the area around Carter Street and Avenue D. (Tr. 6, 238). Walton was unable to recall the exact location of the Malibu when he first observed it or to estimate the distance between the Malibu and his car. (Tr. 39-40). According to Walton, he was driving westbound on Avenue D when he observed the Malibu, which was also traveling westbound on Avenue D. (Tr. 6, 40). Walton testified that he observed the Malibu run a red light. (Tr. 6-7, 41-42). Walton was unable to identify the particular red light that the vehicle went through, but testified that it was one of the intersections of Avenue D, at Carter Street, Norton Street or Hudson Avenue. (Tr. 7-8, 34, 41-42; Government's Exhibit ("G. Ex.") 1; Defendant's Exhibit ("D. Ex.") B).

Walton explained that he did not immediately attempt to stop the Malibu because the snow-covered road made it unsafe to pull the car over. (Tr. 9, 43-44). Walton continued to follow the Malibu and observed the driver make a right turn onto Hudson Avenue, followed by a

right turn onto Durnan Street.  (Tr. 9, 61, 187, 239).  Walton followed the vehicle onto Durnan

Street.  (Tr. 10).

Walton testified that he had been trained to visually estimate the speed of moving

vehicles.  (Tr. 11-14).  Although his patrol vehicle was equipped with radar, the radar was not on

at the time Walton observed the Malibu.  (Tr. 62).  Walton testified that it was his practice not to

use radar during patrol duty in the City.  (Tr. 63-64).  According to Walton, he visually estimated

that the Malibu was traveling at approximately forty miles per hour eastbound on Durnan Street,

a thirty-mile-per-hour zone.  (Tr. 9-10, 14).  He also observed the Malibu swerving back and

forth on the snow-covered street.  (Tr. 10, 44).  Walton testified that the Malibu's speed, coupled

with the snowy conditions, posed a danger to its passengers and the public.  (Tr. 23).

Walton activated his emergency lights and pulled the Malibu over in front of 103

Durnan Street at approximately 7:18 p.m.  (Tr. 14-15, 55).  He approached the driver of the

vehicle, and Gorevski approached the passenger side of the vehicle.  (Tr. 15-16).  Neither drew

his firearm.  (Tr. 32, 54-55).  The vehicle had three occupants: the driver, subsequently identified

as Brock, the front-seat passenger, identified as Tyshawn Simmons, and an unidentified back

seat passenger.  (Tr. 15, 31-32, 53-54).  Walton asked Brock for his driver's license.  (Tr. 15).

As he did so, he detected the odor of burnt marijuana from inside the vehicle.  (Tr. 16-17,

246-47).  Walton testified that he had received training to detect the scent of marijuana and had

identified the smell of marijuana during previous traffic stops.  (Tr. 17).

Walton asked Brock to step out of the vehicle.  (Tr. 17-18).  Walton testified that

he performed a "quick pat down" of Brock to search for weapons, which uncovered none, and

placed him in handcuffs in the back of his patrol vehicle.  (Tr. 18).

Walton testified that Troopers Kien, Salamone, and Bast were also patrolling the same area that evening – Salamone and Bast in one marked patrol vehicle, and Kien in another, accompanied by a canine named Dodge.  (Tr. 5, 19, 30-31, 55, 62, 79).  Walton could not recall whether he or Gorevski had used his vehicle radio to alert the other troopers to the traffic stop. (Tr. 55-56).  Moments after he placed Brock in the vehicle, Troopers Salamone, Bast and Kien arrived on scene.  (Tr. 18-20, 55-56

Salamone asked Walton whether he needed any assistance, and Walton directed him to search Brock more thoroughly.  (Tr. 19, 31, 57).  Walton testified that he wanted Brock to be searched for drugs because he had smelled marijuana when he approached the Malibu. (Tr. 20).  Walton testified that Salamone removed Brock from the patrol vehicle, searched him next to the back door of the vehicle, and discovered a plastic sandwich bag containing seven glassine bags during the search, which subsequently tested positive for cocaine.  (Tr. 20-21, 76-77).  Brock was arrested for criminal possession of a controlled substance and was cited for vehicle and traffic violations, including running a red light, not maintaining reasonable and prudent speed, operating a vehicle without a front license plate, and operating a vehicle with a bald tire.  (Tr. 20-22).  Walton noticed that the Malibu had no front plate and a bald tire after he stopped the vehicle.  (Tr. 22, 185).

Walton testified that Gorevski searched the Malibu and found no drugs inside the car and that he did not believe that the canine was used to search the Malibu.  (Tr. 21-22, 59-61, 79).  Walton also testified that Simmons and the other passenger were searched as well. (Tr. 58-59, 78).

Walton also testified about the following handwritten note that is contained in his case file:

~~Hudson~~ / North   –   1180-a
Ave D.                    ~~1179-a~~
down Roycroft     avoiding inter.
No front plate
No mirror
375-35 c

(Tr. 178-79; D. Ex. D1).  He testified that he made the note at the Scottsville Road barracks

shortly after the traffic stop in order to assist in writing the traffic tickets.  (Tr. 28, 179-80).

Walton could not recall what he meant by the phrase "Down Roycroft"; although he believed the

phrase "avoiding inter." meant avoiding an intersection, he did not write a ticket for avoiding an

intersection.  (Tr. 180-81, 184).  Walton testified that the Malibu may have traveled through a

parking lot on Hudson Avenue between Roycroft and Durnan Street by entering it near Roycroft

and exiting it on Durnan Street."  (Tr. 190; D. Ex. B).  Walton also did not know why Hudson

was crossed out and replaced with Avenue D.  (Tr. 182).  According to Walton, the notation

"1180-a" referred to the provision of the New York State Vehicle and Traffic Law prohibiting

traveling at a speed not reasonable and prudent; he did not know to which intersection the

notation "1180-a" referred.  (Tr. 182-84).  The notation "375-35c" referred to the provision

prohibiting bald tires.  (Tr. 185).

Walton testified that he was not familiar with the Malibu or its occupants before

the traffic stop and that he did not run a license plate check of the vehicle until after the stop.

(Tr. 34, 239).  After the stop, Walton ran a driver's license check, which automatically triggers a

check for outstanding warrants, but did not request any type of field interview form ("FIF")

information.  (Tr. 239, 242-43).  Walton testified that he did not learn that the Malibu's

occupants were under investigation by the special investigation section of the Rochester Police

Department until he was contacted by Investigator Morales approximately one month after the

stop.  (Tr. 240-41).

B.      **Testimony of Gorevski**

Gorevski testified that he was on duty with Walton on the evening of January 4, 2013.  (Tr. 89).  Gorevski first observed the Malibu when his patrol vehicle was traveling westbound on Avenue D near the intersection of Avenue D and Carter Street.  (Tr. 89-90).  Gorevski testified that the Malibu was traveling westbound on Avenue D in front of his patrol vehicle.  (Tr. 90).  Gorevski was unable to estimate the distance between the two vehicles and did not observe the Malibu run a red light.  (Tr. 90-91).

Gorevski testified that they followed the vehicle and observed it make a right onto Hudson Avenue and a further right onto Durnan Street.  (Tr. 95-96).  After stopping the Malibu on Durnan Street, Gorevski approached it and observed three individuals inside.  (Tr. 100).  Gorevski explained that although he and Walton needed backup assistance because they were outnumbered, he did not call for backup or recall Walton requesting assistance.  (Tr. 100-02).  Gorevski shined his light into the Malibu and smelled a "strong odor of marijuana emanating from the vehicle."  (Tr. 101, 103).  He removed the front seat passenger from the car, handcuffed him, and searched him for marijuana.  (Tr. 103-04).  Gorevski was unable to remember the passenger's name and did not recall placing him into a patrol vehicle.  (Tr. 95, 104).  According to Gorevski, other troopers, including Salamone, Bast, and Kien, arrived at the scene, and he transferred the front seat passenger to one of them and then searched the Malibu.  (Tr. 104-05).

Gorevski testified that he met with Walton and the prosecutor to prepare for the evidentiary hearing and acknowledged that Walton's recollection of the events, which was sharper than his, helped him recall some of the details.  (Tr. 110-11).

C.    **Testimony of Salamone**

Salamone testified that he responded to the traffic stop on Durnan Street on January 4, 2013 at approximately 7:18 p.m., but did not recall how he was called to the scene. (Tr. 122, 124).  Prior to his arrival, Salamone had not observed the Malibu and was not familiar with it, nor was he aware whether Brock had been mentioned in any FIFs.  (Tr. 122-23).

Salamone could not recall the color of the vehicle that was stopped, the number of people in it, or the precise location of Walton and Gorevski when he arrived.  (Tr. 126-27). Salamone saw Walton in the street and asked him whether he needed assistance.  (Tr. 125). Walton told Salamone that he had smelled marijuana and had conducted a pat down of an individual for weapons, and asked Salamone to conduct "a more thorough search" of the individual in his patrol vehicle for marijuana.  (Tr. 128-31).  Salamone did not know the name of the individual whom he searched, did not speak with him prior to the search, and did not run any information checks on him.  (Tr. 137-38).

Salamone removed Brock, who was handcuffed from behind, and searched him near the rear, passenger side of the vehicle.  (Tr. 132-33).  He searched Brock's upper chest area for "secondary pockets or anything around his neck" and then checked his armpit areas. (Tr. 132).  He checked his waistband area and opened the front and rear of his pants and looked inside with his flashlight.  (*Id.*).  According to Salamone, he observed a plastic bag in Brock's pants near his genitals.  (Tr. 135-36).  Salamone testified that he retrieved the plastic bag, which contained several other bags containing chunky white substances.  (Tr. 135).  Salamone informed Walton that he had found suspected drugs.  (*Id.*).

**D.**     **Testimony of Kien**

Kien testified that he could not recall how he was summoned to the traffic stop. (Tr. 141).  According to Kien, he had no recollection of the traffic stop beyond the information contained on the job card.  (*Id.*).  Kien testified that he was certain that he did not remove the canine Dodge from his vehicle during the traffic stop because he would have documented it on the job card had he done so.  (Tr. 141-42).

**E.**     **Testimony of Fischer**

Fischer testified that he was a research technician for the Rochester Police Department's 911 Emergency Communications Department.  (Tr. 157-58).  His responsibilities included processing requests for 911 recordings and dispatch printouts.  (Tr. 158).  In response to a subpoena in this case, he produced police dispatch recordings for the evening in question and a CAD printout.  (Tr. 159-60; D. Exs. K and L).  According to Fischer, the audio begins at approximately 7:18 p.m. and concludes at approximately 7:28 p.m.  (Tr. 161

Fischer testified that the CAD printout was a timeline of events entered by the dispatcher relating to the traffic stop.  (Tr. 163, 166; D. Ex. L).  The first entry, at 7:18 p.m., reflects that a trooper contacted the 911 Center to report that they were onsite at Durnan Street.  (Tr. 166; D. Ex. L).  According to Fischer, the identification number for that contact was associated with Salamone and Bast.  (Tr. 166).  Subsequent entries at approximately the same time reflect that Kien, Walton and Gorevski were also at the scene.[3]  (Tr. 166-67; D. Ex. L).  An entry approximately ten minutes later reflects that an individual was taken into custody by either Walton or Gorevski.  (Tr. 169; D. Ex. L).  A later entry reflects that the Malibu's license plate had been checked, and the job was closed at approximately 11:16 p.m.  (Tr. 170; D. Ex. L).

---

[3]  According to Fischer, although the troopers were all placed on the job at the same time, they did not necessarily all arrive at the scene at the same time.  (Tr. 173).

F.      **Testimony of Brock**

Brock testified that at approximately 6:50 p.m. on January 4, 2013, he left his grandmother's house on Aebersold Street in Rochester in a blue Malibu and drove to Lincoln Street in order to pick up Simmons, who had called him to request a ride from his aunt's house. (Tr. 195-97, 219-21).  Brock was accompanied by another individual, who was in the front passenger seat of the car.  (Tr. 196-97, 219).  According to Brock, Simmons appeared in front of his aunt's house, got into the back seat of the car, and asked Brock to drive him to Durnan Street. (Tr. 198-99, 221, 226).  Simmons did not specify a particular address on Durnan Street. (Tr. 221, 235).

From Lincoln Street, Brock made a right turn onto Merrimac Street, turned right onto North Street, stopped and waited for a light to turn green at the intersection of North Street and Clifford Avenue, and stopped at a light at the intersection of North Street and Avenue D. (Tr. 199-200; D. Ex. C).  After the light turned green, he drove along North Street towards Roycroft Drive.  (Tr. 200; D. Ex. C).  As he passed through the intersection, he observed a yellow stripe pass his car, traveling on North Street in the opposite direction.  (Tr. 200-01, 223). Brock believed that the yellow stripe was a marked trooper patrol vehicle.  (Tr. 200-01).  Brock made a left turn onto Roycroft Drive, a one-way street.  (Tr. 202; D. Ex. C).

Brock testified that the road conditions were not good and, to avoid black ice, he entered the parking lot at the corner of Roycroft and Hudson Avenue in order to bypass the intersection.  (Tr. 202, 232; D. Ex. C).  According to Brock, the parking lot was accessible from Roycroft Drive and Hudson Avenue, but not from Durnan Street.  (Tr. 203).

Brock exited the parking lot by turning right onto Hudson Avenue and then onto Durnan Street.  (Tr. 204, 217; D. Ex. C).  Brock acknowledged that he could have reached

Durnan Street by continuing to travel on North Street to the intersection of Durnan Street. (Tr. 235-36). According to Brock, however, he chose to travel down Roycroft to Hudson in order to access a one-way section of Durnan Street, even though he claimed not to know where on Durnan Street Simmons wanted to go. (Tr. 235-36).

Brock testified that he never drove faster than twenty or twenty-five miles per hour from Aebersold Street to Durnan Street and that he drove approximately ten miles per hour on Durnan Street. (Tr. 204-05, 232-35). Brock acknowledged that he had smoked marijuana in the Malibu, but testified that he was unsure whether any marijuana had been smoked in the car that day. (Tr. 224-25). He testified that although he smoked marijuana "regularly," he and his passengers did not smoke it in the car during the drive from Aebersold Street to Durnan Street. (Tr. 225). Brock admitted that the Malibu may have smelled like marijuana. (*Id.*).

As he drove on Durnan Street, Brock observed some individuals on the right side of the road between addresses 104 and 107, and Simmons directed him to pull over. (Tr. 205, 222). He pulled over, immediately heard sirens, and observed a New York State Police patrol vehicle behind the Malibu. (Tr. 205-06). Another patrol vehicle with flashing lights was in front of his car, while another pulled alongside the driver's side. (*Id.*).

Troopers approached the Malibu and directed Brock to put his hands over his head; Brock complied. (Tr. 207). The troopers directed him to unlock the door. (Tr. 207-08). Brock put the vehicle in park and unlocked the door. (*Id.*). The troopers opened the driver and the back passenger doors of the Malibu. (*Id.*). Brock was handcuffed and led to the driver's side passenger door of the trooper vehicle parked directly behind the Malibu. (Tr. 209). Brock overheard a trooper indicate that the Malibu smelled like a skunk, which Brock interpreted to mean that it smelled like marijuana. (Tr. 237). Brock observed three or four troopers searching

11

the Malibu.  (Tr. 210).  He also observed a canine on the curb by the passenger side of the

trooper vehicle.  (*Id.*).

    One of the troopers searched Brock by running his hand across Brock's shoulders,

waist, and legs.  (Tr. 209).  The trooper also shook Brock's pants legs and asked him for

identification.  (*Id.*).  Brock told the trooper that his wallet was in his back pocket, and the

trooper removed the wallet, retrieved the identification, and placed Brock into the back

passenger seat of the trooper vehicle.  (*Id.*).  Simmons was already in the back seat of the vehicle

on the passenger side, and Brock sat behind the driver's seat.  (Tr. 211).

    Approximately five minutes later Brock was removed from the patrol vehicle and

held by the back door of the vehicle.  (Tr. 211-12).  According to Brock, a trooper near the

sidewalk held up a bag allegedly containing marijuana.  (Tr. 215, 227-28).  Brock denied that he

threw the marijuana from the Malibu.  (Tr. 215, 228).  The trooper replied, "[Y]ou ain't gonna

get charged [with] the wee[d], we know you all[;] [w]e know you didn't throw the weed out of

the car."  (Tr. 215, 228).  Brock testified that he began to talk to the trooper standing with a

canine.  (Tr. 212, 228).  Brock asked the dog's gender and name, and the trooper told him that

the dog was a female named Dodge.  (Tr. 214, 226).  Brock also asked why the dog was

"jitterish," and the trooper responded that the dog was young.  (Tr. 214).  According to Brock,

the trooper jokingly told him that the canine was going to search Brock's person.  (Tr. 212, 227).

Brock responded that the dog would not be used to search him.  (Tr. 212).

    Brock testified that he heard one trooper tell another "search him, he FIF."

(Tr. 212, 228).  Brock asked what "FIF" meant, but the trooper did not answer him and

immediately searched him.  (Tr. 212-13).  The trooper shook Brock's sweater and then

unbuckled his pants.  (Tr. 213, 230).  According to Brock, the trooper pulled Brock's pants down

and attempted to pull his sweatpants away from his waist. (*Id.*). The sweatpants repeatedly

snapped back, and the trooper then pulled down to Brock's knees his sweatpants, long johns, and

underwear. (Tr. 213, 230-31). While Brock was naked from his waist to his knees, the trooper,

using a flashlight, discovered a bag of narcotics underneath Brock's testicles. (Tr. 213, 230-32).

According to Brock, the bag contained cocaine that he intended to sell. (Tr. 218-19). Brock

testified that the second search occurred approximately two or three minutes after he was

removed from the trooper vehicle. (Tr. 229).


# REPORT & RECOMMENDATION

## I.   Juvenile Delinquency Act

I turn first to Brock's contention that the Juvenile Delinquency Act ("JDA"), 18

U.S.C. §§ 5031 *et seq.*, applies to Count One of the indictment charging him with conspiracy to

commit narcotics offenses from January 2006 through April 2013.[4] (Docket ## 183 at ¶¶ 5-7,

362). According to Brock, because the conspiracy is alleged to have commenced before his

eighteenth birthday on June 8, 2011, he is entitled to the protections afforded by the JDA.

(Docket # 183 at ¶¶ 5-7). The government counters that the charged conspiracy is a continuing

offense that extended beyond Brock's eighteenth birthday and thus may not be construed as an

act of juvenile delinquency within the meaning of the JDA. (Docket # 203 at 1-3). Specifically,

the government notes that the original criminal complaint and the indictment allege that Brock

participated in criminal conduct in furtherance of the conspiracy in June and August 2012, after

his eighteenth birthday. (*Id.*).

---

[4] The precise relief that Brock seeks is unclear. Because the JDA is jurisdictional, *see United States v. Wong*, 40 F.3d 1347, 1363 (2d Cir. 1994) ("[t]he [JDA] regulates the exercise of federal jurisdiction over juvenile defendants"), *cert. denied*, 514 U.S. 1113 (1995), I will proceed by report and recommendation.

In this case, Brock was over eighteen, but not yet twenty-one at the time he was charged with narcotics conspiracy in the complaint, the original indictment, and the first two superseding indictments[5] (Docket ## 1, 33, 87, 215); thus, the JDA would have applied if the charged conduct had been an act of "juvenile delinquency" within the meaning of the JDA. *See* 18 U.S.C. § 5031 (defining a "juvenile" as a "person who has not attained his eighteenth birthday, or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has not attained his twenty-first birthday"); *United States v. Welch*, 15 F.3d 1202, 1207 (1st Cir. 1993) ("the [JDA] does not apply to 'a defendant who … is not a juvenile and who has not committed an act of juvenile delinquency'") (quoting *United States v. Doerr*, 886 F.2d 944, 969 (7th Cir. 1989)), *cert. denied*, 511 U.S. 1076 (1994). The JDA defines an act of "juvenile delinquency" as a "violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult." 18 U.S.C. § 5031. Thus, the relevant question is Brock's age at the time he allegedly committed the offense charged in Count One. *United States v. Wong*, 40 F.3d at 1365.

As the Second Circuit has observed, "[i]t is well established that federal courts have jurisdiction over conspiracies begun while a defendant was a minor but completed after his eighteenth birthday." *Id.* at 1365. "Because conspiracy is a continuing crime that 'endures until its objectives are either completed or abandoned,'" *id.* at 1366 (quoting *United States v. Lovell*, 16 F.3d 494, 497 (2d Cir. 1994)), the JDA "does not … prevent an adult criminal defendant from being tried as an adult simply because he first became embroiled in the conspiracy with which he is charged while still a minor," *id.* at 1365 (quoting *United States v. Spoone*, 741 F.2d 680, 687

---

[5] The third superseding indictment was returned after Brock's twenty-first birthday. (*See* Docket # 362).

(4th Cir. 1984), *cert denied*, 469 U.S. 1162 (1985)).  Rather, "a federal court may assume jurisdiction over a defendant 'upon a "threshold demonstration of post-eighteen conspiracy activity."'" *Id.* (quoting *United States v. Maddox*, 944 F.2d 1223, 1233 (6th Cir.), *cert. denied*, 502 U.S. 950 (1991)); *United States v. Gay*, 2015 WL 3579880, *2 (E.D. Mich. 2015) ("when a defendant indicted between the ages of eighteen and twenty-one *ratifies* his participation in the conspiracy *after* his eighteenth birthday, then the conspiracy is no longer considered an act of 'juvenile delinquency,' and the [JDA] does not bar prosecution").

       In this case, the original complaint alleged that a confidential informant made several controlled purchases of crack cocaine from Brock beginning in August 2012, after he turned eighteen.  (Docket # 1 at ¶¶ 84-86).  The pending indictment, like the original, first, and second superseding indictments, alleges that in June 2012 Brock participated in an attempt to murder a government informant in furtherance of a federal offense.  (Docket ## 33, 87, 215, 362).  The government maintains that this conduct was in furtherance of the conspiracy.  (Docket # 203 at 3).  These allegations are sufficient to satisfy the government's burden of establishing a "threshold demonstration" that Brock engaged in conduct in furtherance of the conspiracy after he turned eighteen.[6]  *See Wong*, 40 F.3d at 1366 ("[defendant's] conviction for conspiring to murder [the victim] . . . establish[es] the requisite post-eighteen conduct to furnish the district court with jurisdiction over the . . . RICO conspiracy charges of which [he was] convicted"); *United States v. Machen*, 576 F. App'x 561, 566 (6th Cir. 2014) (evidence that defendant was associated with gang activity and participated in another individual's initiation constituted a

---

      [6]  Of course, as the government concedes (Docket # 203 at 3 n.1), the issue of whether the government can prove that Brock engaged in conspiratorial conduct after he turned eighteen is a matter for the jury.  *See United States v. Welch*, 15 F.3d at 1209 ("[a] finding of 'participation' or 'ratification' ordinarily depends heavily upon (i) common-sense evaluations of the youthful defendants' actions – viewed in the context of the criminal enterprise and the conduct of their coconspirators – and (ii) inferences as to the state of mind of the various actors[;] . . . [t]hese are matters especially suited to jury resolution").

"threshold showing" of post-eighteen ratification sufficient to confer subject-matter jurisdiction over RICO conspiracy charge); *United States v. Vargas-De Jesus*, 618 F.3d 59, 65-66 (1st Cir. 2010) (district court had jurisdiction over narcotics conspiracy charge where "[t]here was ample evidence . . . that the defendant continued his participation in the conspiracy after he reached the age of majority"); *United States v. Gjonaj*, 861 F.2d 143, 144 (6th Cir. 1988) (electronic surveillance revealed defendant's participation in narcotics transaction after his eighteenth birthday; "[t]he [d]istrict [c]ourt had a firm factual basis for concluding that appellant committed overt acts in furtherance of the conspiracy as an adult and did not err in treating appellant as an adult offender"); *United States v. Cruz*, 805 F.2d 1464, 1476 (11th Cir. 1986) ("[t]he government presented evidence from which a jury could infer that [defendant's] involvement in the conspiracy continued after he turned eighteen – namely, [witness] testimony that subsequent to [defendant's] eighteenth birthday [defendant] invited him down to Miami to purchase cocaine[;] [h]aving made this threshold demonstration of post-eighteen conspiracy activity, [defendant] was properly within the jurisdiction of the district court"), *cert. denied*, 481 U.S. 1006 (1987); *United States v. Jsames*, 2009 WL 3152131, *1 (D. Neb. 2009) (federal court jurisdiction existed over indictment charging defendant with participating in a narcotics conspiracy where the criminal acts allegedly occurred both before and after defendant's eighteenth birthday); *United States v. Wright*, 2009 WL 1911038, *2 (N.D.N.Y. 2009) (JDA did not apply to indictment charging defendant with participating in narcotics conspiracy which began prior to his eighteenth birthday where defendant admitted to committing overt acts in furtherance of the conspiracy after he turned eighteen); *United States v. Davilla*, 911 F. Supp. 127, 129 (S.D.N.Y. 1996) (federal court properly exercised jurisdiction over RICO and conspiracy charges where indictment alleged

defendant's involvement after his eighteenth birthday).  Accordingly, I recommend that the district court conclude that the JDA does not apply to Count One.


## II.      Suppression of Evidence from January 4, 2013 Traffic Stop

Brock also contends that the drugs and any other evidence seized from him during the January 4, 2013 traffic stop should be suppressed.  (Docket # 332).  Brock does not appear to challenge Walton's initial pat frisk of him for weapons or his pre-arrest investigative detention; rather, he challenges the constitutionality of Salamone's subsequent search of his person for drugs.[7]  (*Id.*).  Brock contends that Salamone's warrantless search for narcotics was not justified by any exception to the warrant requirement.  (*Id.* at 1-2, 16).

The government maintains that the search was justified because the smell of burnt marijuana that emanated from the Malibu provided the troopers with probable cause to search both the car and its occupants for weapons and marijuana.  (Docket # 339 at 5-8).  That the search of Brock was bifurcated into two searches – a pat frisk for weapons and a more extensive search for narcotics – did not violate the Fourth Amendment, the government further contends. (*Id.* at 8).

"Warrantless searches and seizures are *per se* unreasonable under the Fourth Amendment unless they fall within one of several recognized exceptions." *United States v. Casado*, 303 F.3d 440, 443 (2d Cir. 2002) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)).  Brock does not appear to challenge that Walton's search was a permissible pat frisk for

---

[7]  Although Brock disputes the government's version of the events that unfolded prior to the traffic stop, his submissions are unclear as to whether he is challenging the validity of the traffic stop.  (Docket # 332 at 2).  Because I find that the seized narcotics should be suppressed, I need not determine the validity of the initial stop even if Brock's submission were construed to raise that challenge.  Further, as discussed below, even crediting the troopers' testimony where it conflicts with Brock's, I conclude that Salamone's search of Brock was unconstitutional.

weapons pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).  The disputed question is whether the subsequent search by Salamone, which involved pulling Brock's clothing away from his body and shining a flashlight into his groin, was legally justified.[8]

   "The Second Circuit has held that a search which is more intrusive than a *Terry* search is tantamount to a warrantless arrest and must be based upon probable cause." *United States v. Clark*, 822 F. Supp. 990, 1001 (W.D.N.Y. 1993) (citing *United States v. Ceballos*, 654 F.2d 177, 182 (2d Cir. 1981)).  Probable cause to arrest exists when the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir.) (quoting *Wakczyk v. Rio*, 496 F.3d 139 (2d Cir. 2007))), *cert. denied*, 555 U.S. 1056 (2008).  "In the search context, the question is whether the totality of circumstances is sufficient to warrant a reasonable person to believe that contraband or evidence of a crime will be found in a particular place." *United States v. Humphries*, 372 F.3d 653, 659 (4th Cir. 2004).  "[I]n both cases, the quantum of facts required for the officer to search or to seize is 'probable cause,' and the quantum of evidence needed to constitute probable cause for a search or seizure is the same." *Id.*

   The Supreme Court has counseled that the probable cause standard is "a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).  In determining whether probable cause exists, a reviewing court must examine the totality of

---

   [8] As the government appears to concede, Salamone's search exceeded the scope of a permissible *Terry* weapons search.  Salamone searched inside Brock's clothing.  *See United States v. Casado*, 303 F.3d 440 at 449 ("the Fourth Amendment protects [individuals] against an intrusion into [their] privacy either by a patdown or by an invasion of [their] clothing, but . . . the latter is more serious than the former, and  . . . this difference has constitutional significance").

circumstances surrounding the search or seizure, *Illinois v. Gates*, 462 U.S. at 230-31, judged from "the perspective of a reasonable police officer in light of his training and experience." *United States v. Delossantos*, 536 F.3d at 159.

   The government maintains that the smell of burnt marijuana coming from the Malibu provided probable cause to search the Malibu and all of its occupants, including Brock, for marijuana.  (Docket # 339 at 5-8).  While I agree that the smell of burnt marijuana in the car justified the investigative detention of its occupants, as well as a search of the vehicle, *see United States v. Wiggins*, 2013 WL 1645180, *1, 6, 12 (W.D.N.Y.) (citing *United States v. Jenkins*, 452 F.3d 207, 214 (2d Cir.) (marijuana scent provided grounds for officers to question occupants about the presence of marijuana), *cert. denied*, 549 U.S. 1008 (2006), and *United States v. Navas*, 597 F.3d 492, 497 (2d Cir.) (automobile exception "permits law enforcement to conduct a warrantless search of a readily mobile vehicle where there is probable cause to believe that the vehicle contains contraband"), *cert. denied*, 562 U.S. 954 (2010)), *report and recommendation adopted*, 2013 WL 2553971 (W.D.N.Y. 2013), I disagree that the smell of burnt marijuana in the vehicle, without more, provided probable cause to search each of the occupants for marijuana.

   "An individual's mere presence at a location for which probable cause to search exists or in the company of another for whom probable cause to arrest exists does not, standing alone, give rise to probable cause to arrest [or search] that individual."  *United States v. Traylor*, 2009 WL 87470, *7 (W.D.N.Y. 2009) (collecting cases), *aff'd*, 396 F. App'x 725 (2d Cir. 2010), *cert. denied*, 562 U.S. 1245 (2011).  Further, the existence of probable cause to search a vehicle does not automatically confer the right to search its occupants.  *See Wyoming v. Houghton*, 526 U.S. 295, 303 (1999) (citing *United States v. Di Re*, 332 U.S. 581 (1948) (probable cause to search a car did not justify body search of a passenger)).  Thus, although an officer's trained

detection of the smell of burnt marijuana in a car permits the officer to search the car for that marijuana, *see United States v. Humphries*, 372 F.3d at 659 ("[i]n the case of a search, when the odor emanates from a confined location such as an automobile or an apartment, we have held that officers may draw the conclusion that marijuana is present in the automobile or the apartment"), the smell alone is insufficient to establish probable cause to believe that each occupant in the car possessed marijuana, *see id.* ("probable cause to believe that marijuana is located in an automobile . . . may not automatically constitute probable cause to arrest all persons in the automobile . . . ; some additional factors would generally have to be present, indicating to the officer that those persons possessed the contraband").

In this case, no evidence was adduced that the troopers observed any or all of the occupants smoking marijuana or holding a joint, blunt, roach or other form of burning marijuana. None of the troopers testified that the scent was especially strong in the driver's area of the car or on Brock's person or clothing when he was removed from the vehicle. Nor did any of the troopers testify that Brock's appearance or behavior suggested that he was under the influence of marijuana or unusually nervous. None apparently questioned Brock or his passengers about the smell or the presence of marijuana. Finally, the search of the vehicle did not yield any marijuana or marijuana residue, which might have provided probable cause to believe that Brock constructively possessed marijuana.

Instead, the testimony demonstrates that during a routine traffic stop of individuals unfamiliar to them, the troopers detected the scent of marijuana in the automobile. Without any additional grounds to suspect that any occupant in particular, or all of them as a group, possessed marijuana and, without investigating further, the troopers searched Brock for drugs. Under the totality of the circumstances, I conclude that the troopers lacked probable

20

cause to believe that Brock possessed marijuana and therefore conclude that Salamone's search was unconstitutional.[9]  *See Humphries*, 372 F.3d at 659 (odor of marijuana may provide probable cause to believe that a person has committed or is committing the crime of possession of marijuana if an officer "can localize [the] source [of the odor] to a [particular] person"); *United States v. Soyland*, 3 F.3d 1312, 1314 (9th Cir. 1993) (passenger's "mere presence" in a vehicle that smelled of methamphetamine and contained marijuana cigarettes was insufficient to establish probable cause for search; "[t]here was not a sufficient link between [the passenger] and the odor of methamphetamine or the marijuana cigarettes"), *cert. denied*, 115 S. Ct. 32 (1994); *United States v. Mitchell*, 2012 WL 6827387, *9 (W.D.N.Y. 2012) (smell of marijuana emanating from vehicle was likely insufficient "probable cause to justify an arrest at the time of the search"), *report and recommendation adopted*, 2013 WL 132459 (W.D.N.Y. 2013); *United States v. Ocampo*, 2007 WL 3227604, *1, 4 (E.D. Mich. 2007) (odor of marijuana and marijuana smoke emanating from vehicle was insufficient to establish probable cause to search driver of the vehicle).  In reaching this conclusion, I recognize that the government has cited several cases for the general proposition that the smell of marijuana emanating from an automobile, without more, provides probable cause to search the occupants of the vehicle.  (Docket # 339 at 5-8).  I find that these cases are factually distinguishable or otherwise unpersuasive.  *See*, *e.g.*, *United States v. Teran*, 496 F. App'x 287, *2 (4th Cir. 2012) (smell of marijuana intensified as passenger stepped out of vehicle), *cert. denied*, 133 S. Ct. 1838 (2013);[10] *Garcia v. Aguiar*, 138 F. Supp. 2d 298,

---

[9]  The government has not contended that the troopers would have arrested Brock for the observed traffic violations and would have searched him incident to arrest and inevitably discovered the cocaine.  Indeed, Brock noted in his post-hearing submission that the government had not advanced these arguments, and the government's responsive submission did not disagree.  (Docket ## 332, 339).

[10]  This non-binding Fourth Circuit case is curious in so far as it does not cite *Humphries*, *supra*, an earlier case decided by the same court, and cites two other Fourth Circuit cases that addressed searches of vehicles, not persons.  *See United States v. Teran*, 496 F. App'x 287 at *2 (citing *United States v. Carter*, 300 F.3d 415, 422 (4th Cir.) (smell of marijuana provided probable cause to search passenger area of vehicle), *cert. denied*, 537 U.S. 1065

303 (N.D.N.Y. 2001) (citing authority limited to searches of automobiles, not drivers or passengers); *United States v. O'Neal*, 2001 WL 1013306, *2 (D. Kan. 2001) (probable cause to search occupants where vehicle and driver smelled of marijuana and where marijuana roaches were found in the front and back of the vehicle).

The Supreme Court has made clear that a Fourth Amendment violation does not automatically require exclusion of evidence obtained as a result of the violation. *Herring v. United States*, 555 U.S. 135, 140 (2009). The exclusionary rule should apply only where it would result in appreciable deterrence and where the benefits of deterrence would outweigh its costs. *Id.* at 141. I recommend that the district court apply the exclusionary rule here because the government has not argued, let alone demonstrated, that it should not apply, *see United States v. Seldinas*, 62 F. Supp. 3d 287, 299 (W.D.N.Y. 2014) ("[*Herring*] is not an issue that is necessary for me to resolve[;] [i]t is the government's 'burden to prove that the exclusionary remedy is not a proper remedy for the violation of the Fourth Amendment,' and it has made no attempt to satisfy that burden") (quoting *United States v. Anderson*, 2012 WL 3535771, *6 (W.D.N.Y.), *report and recommendation adopted*, 2012 WL 3528971 (W.D.N.Y. 2012)), *report and recommendation adopted in part and rejected in part*, 2015 WL 1823532 (W.D.N.Y. 2015), and I find that the benefits of deterrence outweigh its costs in this case.

## DECISION AND ORDER

Also before this Court for Decision and Order are motions by Brock for a bill of particulars and *Brady* disclosure. (Docket # 183). According to Brock, he is contemplating offering a multiple conspiracies defense to Count One – that is, he was not part of the conspiracy charged, but was involved in a smaller, separate conspiracy that included his father. (*Id.* at ¶ 9).

---

(2002), and *United States v. Haley*, 669 F.2d 201, 203 (4th Cir.) (smell of marijuana provided probable cause to search vehicle), *cert. denied*, 457 U.S. 1117 (1982)).

Brock's attorney has intimated that he may also offer a "buyer-only" defense.[11]   Brock requests

that the government be ordered to provide him with a bill of particulars (*id.* at ¶¶ 9-14) and

*Brady* disclosure (*id.* at ¶¶ 25-26) relating to these anticipated defenses.


I.   **Bill of Particulars**

      I turn first to Brock's motion for a bill of particulars.  (Docket # 183 at ¶¶ 9-14).

With respect to Count One, Brock seeks additional particularization regarding his conduct in

furtherance of the charged conspiracy.  (*Id.* at ¶ 9-11).  With respect to Count Two, Brock

requests additional particularization concerning the specific firearms he is alleged to have

possessed and the dates or periods during the seventy-eight month period that he and three of his

co-defendants are alleged to have possessed them in furtherance of the conspiracy.  (*Id.* at ¶ 11).

With respect to Count Three, Brock maintains that he is entitled to additional particularization

regarding the federal offense referenced in the count.  (*Id.* at ¶ 12).  Finally, Brock requests *in

camera* production of the identities of any unindicted co-conspirators.  (*Id.* at ¶ 13).

      The government opposes the motion on the grounds that Brock sufficiently

understands the charges and has been provided with substantial and detailed discovery, as well as

information disclosed by the government during Brock's pretrial detention hearing, to make his

request unnecessary.  (Docket # 203 at 4-5).  During oral argument on October 17, 2013, the

government generally described the information that had been provided to Brock during

discovery.

      The government represented that it had provided Brock with reports describing

multiple sales of narcotics by Brock to a confidential informant beginning in August 2012.

---

[11]  *See* Docket # 457 (citing *United States v. Brock*, 789 F.3d 60 (2d Cir. 2015) and *United States v. Martinez*, 2015 WL 5673115 (W.D.N.Y. 2015)).

According to the complaint, beginning in August 2012, a confidential informant made more than ten controlled purchases of crack cocaine from Brock.  (Docket # 1 at ¶ 84).  The informant indicated that he had purchased crack from Brock prior to August 2012 and that Simmons was also present during several of the prior transactions.  (*Id.* at ¶ 85).  The complaint also alleged that Brock had been arrested in January 2013 for possession of crack cocaine following a traffic stop (the subject of the suppression hearing described *supra*).  (*Id.* at ¶ 87).

As the government stated during oral argument, its proffer during Brock's detention hearing included information about his alleged involvement in two shootings – one in December 2011 and one in June 2012 (which is the subject of Count Three).  At the detention hearing, the government proffered information that on December 28, 2011, police officers responded to a shooting on Hudson Avenue in the city of Rochester in which three people were shot.  (Docket # 356 at 36).  According to the proffer, a van that was observed leaving the scene of the shooting crashed nearby and its occupants fled on foot.  (*Id.*).  The owner of the van advised the officers that he had lent the van to Brock less than an hour before the shooting.  (*Id.*).  During oral argument on this motion, the government further represented that the van owner also stated that he had purchased crack cocaine from Brock for approximately one year prior to the shooting.  The government further proffered that one of Brock's alleged co-conspirators had implicated Brock in the shooting.  (*Id.*).

During oral argument on the pending motion, the government also asserted that it had provided substantial discovery concerning the June 2012 shooting alleged in Count Three.  The government maintained that the evidence would establish that the shooting was in retaliation for the victim's alleged provision of information to law enforcement officers about the narcotics conspiracy charged in Count One.  The government indicated that one of Brock's co-defendants

had been prosecuted on state charges for the shooting and the trial transcripts of the trial were available to Brock.  During the detention hearing, the government described the allegations of the shooting in detail (*id.* at 15-18), indicated that one of the victims had identified Brock as a passenger in a vehicle with the alleged shooter prior to the shooting (*id.* at 16-18), and explained the basis for its contention that the shooting was in retaliation for the victim's alleged provision of information to police concerning a co-defendant's participation in the narcotics conspiracy (*id.* at 18-21).  According to the government, on February 23, 2012, months prior to the shooting, Simmons and McMillian visited the victim and accused him of cooperating with law enforcement.  (*Id.*).

During the detention hearing, the government also summarized intercepted conversations that included co-defendants Simmons, McMillian and McDonald, concerning the gun that was allegedly used in the June 2012 shooting.  (*Id.* at 26-30).  These intercepted communications were summarized in detail both during the detention hearing and in a previous Report and Recommendation issued by this Court.  (Docket ## 356 at 26-30; 450 at 5-11).  The government maintains that these communications demonstrate that the gun was stored at McDonald's residence until it was removed at McMillian's direction.  (*Id.*).  The government further contends that the gun was subsequently seized during a traffic stop and determined to have expelled the shell casings that were found in the area of the June 2012 shooting.  (*Id.*).

During the detention hearing, the government also stated that the confidential informant who allegedly made controlled purchases of crack from Brock told officers that Brock had a firearm on his person during several of the transactions.  (*Id*. at 33).  The government also represented that during the February 2013 execution of a search warrant for Brock's grandmother's house, where Brock was living, officers seized three guns, ammunition, cocaine

and cocaine base, $800 in cash and receipts for earrings and a ring totaling approximately $4,200.00.[12]  (*Id.* at 34-35).

The purpose of a bill of particulars is to enable the defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."  *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citations omitted) (*per curiam*).  A bill of particulars is not to be used as a discovery device to obtain "evidentiary detail" about the government's case.  *See, e.g.*, *United States v. Torres*, 901 F.2d 205, 234 (2d Cir.) (citation omitted), *cert. denied*, 498 U.S. 906 (1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010).  In other words, a bill of particulars should be granted where the information sought is "necessary" to prepare a defense and to avoid double jeopardy, not where it is merely "useful" to the defense in ascertaining the government's proof.  *See United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994); *see also United States v. Love*, 859 F. Supp. 725, 738 (S.D.N.Y.), *aff'd sub nom. United States v. Roberts*, 41 F.3d 1501 (2d Cir. 1994).  Where the charge against the defendant is broad in scope, a bill of particulars may be more appropriate than where the charged conduct is more narrow.  *See, e.g.*, *United States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998) ("a bill of particulars or other adequate disclosure is appropriate where a conspiracy count covers a complex series of events over a number of years, but provides only the bare bones of the charge"); *United States v. Davidoff*, 845 F.2d 1151, 1154-55 (2d Cir. 1988) (district court abused discretion in denying a bill of particulars identifying victims in seven-year racketeering

---

[12]  During a subsequent detention hearing, the government proffered information suggesting Brock's involvement in events relating to a third shooting in October 2012 (which is the subject of Count Nine).  (Docket # 374).  According to the government, a cooperating witness indicated that although Simmons was the shooter, Brock lured the victim to the location of the shooting and drove the get-away vehicle.  (*Id.*).

conspiracy; court noted that principles governing bills of particulars "must be applied with some care when the [g]overnment charges criminal offenses under statutes as broad as RICO").

To warrant a bill of particulars, the indictment's charges against a defendant must be so general that they fail to advise him of the specific acts of which he is accused.  *See United States v. Torres*, 901 F.2d at 234; *United States v. Henry*, 861 F. Supp. at 1198.  In determining that question, the court may consider whether the information sought by the defendant has been made available in alternative forms, such as in discovery or prior court proceedings.  *See United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984); *United States v. Kelly*, 91 F. Supp. 2d 580, 583-84 (S.D.N.Y. 2000); *United States v. Ahmad*, 992 F. Supp. 682, 684 (S.D.N.Y. 1998); *United States v. Feola*, 651 F. Supp. 1068, 1133 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir.), *cert. denied*, 493 U.S. 834 (1989).

Having reviewed Brock's requests, the government's responses, the indictment, the complaint, and the materials before the Court on this motion, I conclude that Brock has been adequately advised of the nature of the charges against him as it pertains to his alleged criminal conduct since December 2010.  As described above, the government has provided information concerning Brock's alleged involvement in the December 2011 shooting, the June 2012 shooting, sales of narcotics to the van owner as early as December 2010, and controlled purchases by a confidential informant beginning in August 2012 and earlier non-controlled purchases by the informant.  Although a defendant is not entitled to particularization of "all the overt acts [the government] will prove in establishing a conspiracy charge," *United States v. Carroll*, 510 F.2d 507, 509 (2d Cir. 1975), *cert. denied*, 426 U.S. 923 (1976), and requests for particularization of the "whens," "wheres" and "with whoms" of particular acts allegedly committed by a defendant in furtherance of a conspiracy are routinely denied, *United States v.*

*Jimenez*, 824 F. Supp. 351, 363 (S.D.N.Y. 1993), I conclude that, given the scope of the conspiracy charged – spanning more than seven years and including eleven identified co-conspirators – coupled with Brock's young age at the time the conspiracy allegedly began, the government should inform Brock whether it intends to introduce evidence that Brock engaged in conduct before December 2010 in furtherance of the conspiracy, including possession of firearms.  The government appears to suggest, as I understand its representations and explanations, that it does not intend to offer any evidence of Brock's involvement in the conspiracy earlier than December 2010.  The government must advise Brock's counsel whether this understanding is accurate and, if not, provide him sufficient information about Brock's pre-December 2010 conduct to adequately prepare his defense to Counts One and Two.

   With respect to Brock's request for particularization concerning the federal offense referenced in Count Three, the government has represented that the federal offense charged is narcotics conspiracy and has provided information in the detention hearing as to the basis for the government's contention that the shooting was in retaliation for the victim's provision of information relating to the narcotics conspiracy.  With respect to the remaining particularization sought by Brock, including the identity of any unidentified co-conspirators, I conclude that the charging documents and the discovery and information provided adequately advise Brock of the factual bases for the charges and the nature of the government's case and that further particularization is not warranted.  *United States v. Santiago*, 174 F. Supp. 2d 16, 37 (S.D.N.Y. 2001).

## II. Disclosure of *Brady* Material

   As articulated in his written submissions and at oral argument, Brock seeks an order requiring the government to provide him with certain reports of witness statements made

during proffers or other investigative interviews.[13]   (Docket # 183 at ¶ 26).   Specifically, he demands disclosure under *Brady* of any reports of witnesses who denied knowing Brock or who failed to mention him.

Pursuant to the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, the government is required to disclose all evidence or information that tends to exculpate the defendant.   *See United States v. Bagley*, 473 U.S. 667 (1985); *Giglio v. United States*, 405 U.S. 150 (1972).   The government opposes Brock's *Brady* motion and has represented that it is aware of its *Brady* obligation to disclose factually exculpatory evidence related to Brock.   (Docket # 203 at 7).   The government contends that Brock's interpretation of the government's *Brady* obligation is overly broad and that his request for any proffer statements or investigative interviews in which the subject denied knowledge of Brock or his involvement lacks specificity.   According to the government, the failure of a particular witness to mention Brock is not necessarily relevant or exculpatory.

Brock's request for disclosure of reports reflecting any witness statements that do not mention or implicate Brock is, in the context of an indictment charging him with involvement in a multi-year conspiracy, overbroad and beyond the scope of required *Brady* disclosure.   It is reasonable to assume that the government has interviewed certain witnesses about acts in furtherance of the conspiracy that did not involve Brock and that they may have interviewed witnesses who did not know Brock.   Such reports would not constitute evidence that Brock was not involved in the charged conspiracy, and Brock's broad request is denied.   *See,*

---

[13]   Brock also requested that the Court order the government's *Brady* obligation to extend to information or material possessed by the Monroe County District Attorney's Office.   Based upon the representations by the government at oral argument that this investigation was not a joint investigation with the Monroe County District Attorney's Office and that the government would produce any *Brady* material possessed by any law enforcement officers who were involved in the investigation, whether they were employed by the city, state, or federal government, I deny Brock's request.   I also deny Brock's general request to conduct an *in camera* review of reports of proffers and investigative interviews.

*e.g.*, *United States v. Sims*, 808 F. Supp. 607, 615 (N.D. Ill. 1992) (defendant's *Brady* request "that the government identify 'each communication of an informant/witness concerning this investigation [that culminated in various criminal charges including narcotics conspiracy against nineteen defendants] which indicated that the defendant was not involved in criminal activity'" was too general; noting "the failure of a particular informant/witness to mention a particular defendant in relation to any given criminal conduct is not necessarily relevant or significant"); *United States v. Deleo*, 1991 WL 111172, *1 (N.D. Ill. 1991) (request for any witness statements that "omitted mention of the defendant" was overly broad); *United States v. Rovy*, 1990 WL 51642, *1 (N.D. Ill. 1990) ("[d]efendants' *Brady* request is overly-broad; they are not entitled to names, statements and documents relating to leads which went nowhere").

Although Brock's broad request is denied, the Court notes that the government's *Brady* disclosure obligation extends to any "communications or statements which either (1) affirmatively indicate that [Brock] was not engaged in wrongdoing, or (2) omit mention of [Brock] and were (a) made by a witness in a position to know whether [Brock] was engaged in illegal conduct, (b) in a context in which the person likely would have mentioned [Brock] if he believed [Brock] had committed criminal acts." *United States v. Deleo*, 1991 WL 111172 at *2; *United States v. Danzi*, 726 F. Supp. 2d 120, 128 (D. Conn.) (alleged co-conspirator's statement that defendant had "'nothing to do with drugs' is plainly the type of evidence that 'go[es] to the heart of the defendant's guilt or innocence'") (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)), *opinion clarified*, 2010 WL 3463272 (D. Conn. 2010); *United States v. Galestro*, 2008 WL 2783360, *16-17 (E.D.N.Y. 2008) (government properly understood the distinction under *Brady* between statements "by a speaker who had a 'specific connection' to defendant and the event at issue [which would be required to be disclosed] . . . and 'general

statements' by a speaker lacking such connection that would not, when viewed in context, be in any way probative or exculpatory"); *United States v. Sims*, 808 F. Supp. at 615 (in response to defendant's general *Brady* request for disclosure of "any communication of any informant or witness that did not mention [defendant]," government required to disclose evidence only "if 'obviously exculpatory' or if 'the omitted evidence would create a reasonable doubt' as to the defendant's guilt") (quoting *United States v. Agurs*, 427 U.S. 97, 107-113 (1976)); *United States v. Rovy*, 1990 WL 51642 at *1 ("*Brady* material does, however, include a professed lack of knowledge by persons, including confidential informants, *who the government can reasonably believe should have knowledge*") (emphasis added). Similarly, if the reports included any witness statements that Brock's association with the alleged co-conspirators was merely as a customer buying drugs, rather than as a seller or distributor of drugs in furtherance of the conspiracy, the government would be required to disclose such statements under its *Brady* obligations. *United States v. Phillips*, 1994 WL 499074, *1 (D.D.C. 1994) ("[t]estimony that defendant was at the premises 'a lot' as a user, not a seller, would have been helpful to his defense[;] [t]he government, counsel and police should have made the effort to make that testimony available to defendant"). *See generally United States v. Brock*, 789 F.3d at 65 (fact that buyer intends to resell, rather than consume, drugs does not demonstrate that buyer has joined the seller's distribution conspiracy; "a good customer – even a very good customer – of a drug organization may still be just a customer, not a co-conspirator, if the evidence cannot support an inference of mutual dependency or a common stake").

The government has acknowledged its obligation under *Brady* and represents that it is unaware of any exculpatory *Brady* material. Nothing in the record suggests that the government misunderstands its continuing *Brady* obligations as described above. Accordingly,

Brock's *Brady* motion is denied without prejudice at this time. *See United States v. Sanchez*, 2003 WL 1900851, *5 (S.D.N.Y. 2003) ("[w]here, as here, the government has made a good-faith representation to the Court and defense counsel that it recognizes and has complied with its disclosure obligations under *Brady,* a defendant is entitled to no further pretrial discovery of *Brady* material"); *United States v. Mercado*, 2003 WL 21756084, *5 (S.D.N.Y. 2003) (same).


## CONCLUSION

For the reasons stated above, Brock's motion for a bill of particulars **(Docket # 183)** is granted in part and denied in part and his *Brady* requests **(Docket # 183)** are denied. Further, for the reasons stated above, I recommend that the district court determine that the JDA does not apply to Count One of the indictment and that it grant Brock's motion to suppress tangible evidence. **(Docket # 183, 332)**.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      December 11, 2015

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[14]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      December 11, 2015

---

[14]   Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).